MILLER INSURANCE AGENCY, Appellant, *v.* HOME FIRE & MARINE INSURANCE COMPANY OF CALIFORNIA et al., Respondents.

(No. 7,405.)

(Submitted September 23, 1935.   Decided October 30, 1935.)

[51 Pac. (2d) 628.]

552

Mr. *S. C. Ford,* Mr. *H. L. Maury* and Mr. *A. G. Shone,* for Appellant, submitted a brief; Mr. *Ford* and Mr. *Maury* argued the cause orally.

*Mr. J. A. Poore,* for Respondents, submitted a brief and argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

The Miller Insurance Agency instituted action for libel against the Home Fire & Marine Insurance Company of California and Ray C. Culver, its general agent for Montana. Issue was joined by answer and reply thereto and a trial had. At the close of plaintiff's case the court granted separate motions of the two defendants for nonsuit and thereupon entered judgment dismissing the action.

The plaintiff has appealed from the judgment and makes the following specifications of error: "The court erred in sustaining the motion for nonsuit as to the defendant Home Fire & Marine Insurance Company of California. 2. The court erred in sustaining the motion for nonsuit in favor of defendant Ray C. Culver. 3. The court erred in entering judgment for both of the defendants. 4. The court erred in refusing to admit in evidence exhibits for identification Z-1, Z-2, Z-3 and Z-4, respectively, as follows: [The exhibits are set forth with the

objection thereto.]'' 5. Misconduct of counsel in stating to a witness, ''You need not wink one eye at your counsel, but wink with both eyes, and I will see that just as readily,'' for which the court refused to admonish counsel.

Counsel for defendants asserts that the first three specifications do not conform to rule X, subdivision 3–c, of this court, in that they amount to but general specifications and, therefore, raise no issue for determination. (*Rogness* v. *Northern Pacific R. Co.*, 59 Mont. 373, 196 Pac. 989, 992.) In the *Rogness Case* this court, after disposing of other questions raised, declared that a general specification that the court erred in denying defendant's motion for a new trial was insufficient, for the reason that there are numerous grounds for a new trial, and such a specification does not advise the court as to what ground the movant relied upon or of any legal question involved. The court closed the discussion with the statement that ''for these reasons a general assignment that the court erred in overruling motion for new trial, or in entering judgment, is insufficient to raise any issue,'' without reference to the requirements of the rule on the subject or the citation of an authority.

In the case of *Samuell* v. *Moore Mercantile Co.*, 62 Mont. 232, 204 Pac. 376, 377, the plaintiff made two assignments of error, viz., that the court erred in entering judgment for the defendant and in denying plaintiff's motion for a new trial. This court declared: ''Counsel for appellant have disregarded the rules of this court in the most flagrant manner. Neither of the two so-called assignments of error presents any question for review (*Rogness* v. *Northern Pacific R. Co.*, 59 Mont. 373, 196 Pac. 989), and their brief is practically devoid of argument and does not contain the citation of a single authority in support of their position. This court ought not to be called upon to do the work which counsel are employed to do, and with perfect propriety we might affirm the judgment and order without reference to the merits, and justify our decision upon reason and numerous decisions of this court and other courts of last

resort.'' In justice to the appellant, however, the court determined the matter on the merits by ''original investigation.''

It will be noted that the work the court was required to do was necessitated, not by reason of the general nature of the specifications of error, but by the failure of counsel to show to the court by precept and citation in their brief and by argument wherein the court erred.

We are of the opinion that the correct interpretation had been given to the rule relied upon, long prior to the decision in the *Rogness Case,* and that this court, in the *Samuell Case,* stated the correct reason for its declaration that it might with propriety affirm the judgment on the condition of the brief.

Rule X, on the preparation of briefs, declares the necessary content thereof by subdivision 3, again subdivided into a, b, c and d. Subdivision c provides that the brief shall contain ''a specification of errors relied upon, which shall be numbered and shall set out separately and particularly each error intended to be urged.'' The manner in which specifications of error on the reception or rejection of evidence and on the charge of the court is then prescribed. Subdivision d requires ''a brief argument, exhibiting a clear statement of the points of law to be discussed * * * and authorities relied upon.'' These provisions have remained unchanged for more than thirty-five years (Rules promulgated in 1899, 22 Mont. xxvii) and were correctly construed in 1904 (*Nord* v. *Boston & Mont. etc. Min. Co.,* 30 Mont. 48, 75 Pac. 681, 683) on the exact question here raised. In the *Nord Case* this court declared: ''There is no requirement that the specification shall set out appellant's reasons why he claims the decision is error. That is purely a matter of argument. It is sufficient under the provisions of this rule, therefore, to simply specify that the court below 'committed error in granting the motion for nonsuit.' The rules of the court are not established for the purpose of befogging attorneys, and a reasonable interpretation of them, therefore, should obtain. The purpose of this subdivision of Rule X, above cited, is to require attorneys to specify and point out the errors of which they com-

plain, and not to give their reasons why they complain it is error, and, if more than one error is charged, to number them and set them out separately and particularly.''

Except where the rule above requires more, a general specification of error is sufficient as a specification of the error on which appellant relies, leaving the reasons for charging error to the brief of argument and oral argument of counsel.

However, although such a specification will be sufficient, if no reference is thereafter made to a specification of error either in the brief or in oral argument, the assignment will be considered waived and will not be given consideration by the court, except, perhaps, in circumstances such as appear in *Samuell* v. *Moore Mercantile Co.*, supra. (*King* v. *Pony Gold Min. Co.*, 28 Mont. 74, 72 Pac. 309; *Lingquist* v. *Seibold*, 62 Mont. 162, 199 Pac. 709; *Burns* v. *Eminger*, 84 Mont. 397, 276 Pac. 437; *Bielenberg* v. *Higgins*, 85 Mont. 56, 277 Pac. 631.) In so far as the opinion in *Rogness* v. *Northern Pacific R. Co.*, supra, is in conflict with the foregoing, it is hereby expressly overruled.

The fourth and fifth assignments are not discussed in the brief and were not argued orally; they are, therefore, under the foregoing rule, deemed waived and will not be here considered. It may be noted, however, that they are of little importance on this appeal. The excluded exhibits were merely cumulative and the alleged misconduct of counsel could only be prejudicial on submission of the cause to the jury.

The reasons urged by counsel for the plaintiff in support of their assignment that the court erred in granting the motions for nonsuit and, consequently, in entering judgment for the defendants, stated succinctly, are that the evidence adduced is sufficient to go to the jury and that, as this is a libel case, the jury is the sole judge of the law and the facts.

The rule in this jurisdiction is that a case should never be withdrawn from the jury unless it appears, as a matter of law, that a recovery cannot be had upon any view of the facts which the evidence reasonably tends to establish; but whenever

there is no evidence in support of plaintiff's case, or the evidence is so unsubstantial that the court would feel compelled to set aside a verdict, if one should be rendered for the plaintiff, a nonsuit should be granted. (*Loudon* v. *Scott,* 58 Mont. 645, 194 Pac. 488, 12 A. L. R. 1487; *Childers* v. *Deschamps,* 87 Mont. 505, 290 Pac. 261; *Rau* v. *Northern Pacific R. Co.,* 87 Mont. 521, 289 Pac. 580.) This rule applies in actions for libel (*Porak* v. *Sweitzer's, Inc.,* 87 Mont. 331, 287 Pac. 633), as the constitutional provision that "the jury, under the direction of the court, shall determine the law and the facts" (Art. III, sec. 10, Constitution of Montana), indicates no purpose to require the court in such cases to abdicate its jurisdiction, as to matters of pleading and practice, to the jury. (*Paxton* v. *Woodward,* 31 Mont. 195, 78 Pac. 215, 107 Am. St. Rep. 416, 3 Ann. Cas. 546; *Manley* v. *Harer,* 82 Mont. 30, 264 Pac. 937.)

The evidence on behalf of the plaintiff discloses the following facts: In 1929 the Home Fire & Marine Insurance Company entered into a written contract with the Bennetts-Bertoglio Company of Butte, by the terms of which the latter was made the local agent of the former in that community without designating the nature of the business to be transacted as such agent, other than as indicated by the agent's covenants therein contained. It bound the agent "to perform faithfully all duties pertaining to such agency, to observe and carry out the rules and instructions of the company and to further its interests in every lawful way." Therein the agent covenanted that during the term of the agreement it would not, either directly or indirectly, accept any commission on "any business relating to the hazards of fire, lightning, earthquake," etc., which are at variance with those paid by the company, and would not participate in any such insurance business of, nor represent, any company not a member of the Board of Fire Underwriters of the Pacific, nor solicit or place any such insurance business with or in any such insurance company. The contract provided that it should be in force until either party should "give written

notice to the other of the intention of such party to terminate the same."

Thereafter the plaintiff, Miller Insurance Agency, bought out the "agent" and succeeded to its rights and duties under the contract. The plaintiff represented four or five other fire insurance companies, but wrote 75 per cent of the business of the agency in the defendant company. The Miller Insurance Agency is, apparently, the *alter ego* of C. E. Miller, Jr., of Butte. In March, 1932, the plaintiff "commenced a campaign in Silver Bow county for the selling of insurance at reduced rates," and, after some correspondence and discussion between Miller and the defendant Culver, on June 22, 1932, Culver, in the name of his company, mailed the following circular letter to at least 150 holders of policies, written by the plaintiff, in the defendant company:

"Please be advised that the Home Fire and Marine Insurance Company heretofore with the * * * Miller Insurance Agency has been transferred to Merle M. David and Raymond E. Schilling who are now our only local representatives authorized to handle matters pertaining to our policies issued through our former agency connections. Our records show that you hold policy No. ——, and we therefore ask that in case of transfer, assignment, loss or any other matter relating to your insurance that require attention, you refer the same to Davis and Schilling. They will be most happy to serve your needs. We hope to have the favor of your continued patronage through Davis and Schilling and we assure you that anything referred to them will be handled expeditiously and to your best interests."

This letter, plaintiff charges, constitutes libel, it being alleged that it was sent maliciously and with the intent in both defendants to wrongfully injure plaintiff in its business, and that all statements therein contained are false and unprivileged and known by the defendants so to be; that it had a tendency to, and did, injure plaintiff's business; and that theretofore plaintiff had advanced to the company premiums on divers policies in the sum of $3,716.87, which the letter prevented the plaintiff

from collecting from policy-holders. It is further alleged that the defendants refused to permit cancellations on refusal to pay premiums, and that the cost of collection, in each instance, would exceed the amount due; and that the publication of the letter caused plaintiff to lose renewals of policies to the damage of plaintiff in the sum of $20,000. Plaintiff demanded judgment for this amount as well as for the $3,716.87 advanced premiums, and for $100,000 exemplary damages.

By answer the defendants admitted the mailing of the letter to 150 policy-holders and the existence of the agency agreement which it is alleged in the answer was terminated on or about April 5, 1932, and denied all other allegations of the complaint. The answer also contains a "special defense," setting up the facts, and alleging that at the time the letter was mailed, the agency agreement had been terminated by mutual consent, and that the letter was mailed in order that the policy-holders might be promptly served by an authorized agent; that this was done without malice and was privileged; and that the statements made therein were true. Plaintiff denied all new matter by reply.

The question for determination now is as to whether, under the law of libel, the undisputed facts show that the plaintiff is not entitled to recover upon any view which the evidence reasonably tends to establish, or whether the evidence is so unsubstantial that the court would feel compelled to set aside any verdict rendered in favor of plaintiff, had the cause been submitted to the jury.

"Libel is a false and unprivileged publication * * * which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Sec. 5690, Rev. Codes 1921.) The truth of the statements made in an allegedly libelous publication "may be given in evidence." (Const., Art. III, sec. 10.) Under our statute above, if the publication is "false and unprivileged," the publisher is liable regardless of good faith, worthy motives or the utmost faith in

the belief that the statement is true. (*Kelly* v. *Independent Pub. Co.*, 45 Mont. 127, 122 Pac. 735, Ann. Cas. 1913D, 1063, 38 L. R. A. (n. s.) 1160.) But no publication which is not false, and no privileged communication, is libel, and, as the statute does not mention "malice," the presence or absence of malice becomes material only as a circumstance affording a basis for increasing or diminishing the amount of recovery, and in cases involving the question of privileged communications. To found liability upon a communication prima facie privileged, actual and not implied, malice must be shown. (*Cooper* v. *Romney*, 49 Mont. 119, 141 Pac. 289, Ann. Cas. 1916A, 596.) Libel is either *per se* or *per quod*. "*Per se*" means by itself, simply as such, and is applied to words which are actionable because they, of themselves without anything more, are opprobrious. To be thus actionable, the words must be susceptible of but the one meaning. (*Burr* v. *Winnett Times Pub. Co.*, 80 Mont. 70, 258 Pac. 242; *Tucker* v. *Wallace*, 90 Mont. 359, 3 Pac. (2d) 404.)

It will be seen, however, that the statutory definition of "libel" contains three clauses in the alternative, connected by the disjunction "or," so that, in the present case, the first two classes may be eliminated, the statute thus reading: "Libel is a false and unprivileged publication * * * which has a tendency to injure him in his occupation." On this phase of "libel" it is immaterial whether the publication contains opprobrious statements or not. (*Bartlett* v. *Federal Outfitting Co.*, 133 Cal. App. 747, 24 Pac. (2d) 877; *Dobbin* v. *Chicago, R. Co.*, 157 Mo. App. 689, 138 S. W. 682; *Wright* v. *Coules*, 4 Cal. App. 343, 87 Pac. 809.)

Language which necessarily caused damage to "him whose affairs it is concerning" is libelous *per se*, because its publication confers a prima facie right of action. (Thompson on Slander & Libel, 4th ed., 158.)

In *Lemmer* v. *The Tribune*, 50 Mont. 559, 148 Pac. 338, this court apparently overlooked the significance of the final clause of the statute, and, applying the rule applicable to cases brought

under the first and second clauses, held that a publication to the effect that a business man—stating his business—was dead, was not libel *per se*. The cases cited to support this holding are not in point, as they do not come within the final clause of the definition above. In so far as the opinion in *Lemmer* v. *The Tribune* conflicts with what is herein said, it is now overruled.

The complaint herein is sufficient, whether it sufficiently alleges special damages or not.

The defendants have cited several opinions of courts of sister states holding that notices similar to the one here considered are not libelous *per se,* but they are not persuasive here, as in no one of them is a statute such as ours considered, and in each the statement is based upon the premise that in order to constitute libel, the publication must be defamatory.

No one will dispute that to publish, of one who makes a livelihood by writing insurance, that he is no longer the agent of the company in which he writes it, "has a tendency to injure him in his occupation"; the publication is clear and unambiguous and, of itself, without more, charges a libel if, as alleged, it is "false and unprivileged." This species of libel is more of the nature of "slander of title" (see 37 C. J. 129) than the ordinary case of libel, in that it does not come within the purview of actions for defamation; it is libel merely because our peculiar statute makes it libel. Whatever the damages suffered, the publication here is actionable only if "false and unprivileged," and the burden rested upon the plaintiff to establish this allegation by proof. (*Cooper* v. *Romney,* supra.)

The evidence introduced to show that the plaintiff's agency ▮ had not been terminated at the time the alleged libel was published, and to establish malice, is as follows: Having secured the agency for a company which would write insurance at reduced rates and entered upon his "campaign" to write such insurance, Miller wrote Culver on March 15, 1932: "After considerable consideration I am compelled to believe that I will be able to serve our clients much better from the question of

rates, with companies that are not buying rates. As it has always been my plan of business to be fair, I am compelled at this time to advise you that this is just a question of business, and rest assured that at any time we may be of service to you personally, or to your company that we will be only too glad to. With kindest personal regards, I am yours, very truly. Miller Insurance Agency, C. E. Miller, Jr." On March 31, 1932, plaintiff's state license as agent for the defendant company expired and was not renewed. On April 5 thereafter, Culver demanded and received all supplies, including blank policies, of the defendant company in the office of the plaintiff agency. About this time, according to Miller's testimony, he had a conversation with Culver in which Culver strenuously objected to the agency's change of connection; told him that others had made the same mistake and been sorry for it; that "their organization" had ways of bringing such agents "back into the fold"; and that "If I saw fit to make this change that I would either be back in the fold or broke in a short time." The witness stated that the "organization" referred to "was companies writing at his rate, and not companies writing at the preferred rates, which I was attempting to do and started to do." While the witness testified that he did not know what companies were in and which out of the Board of Fire Underwriters of the Pacific, it is clearly implied in the record that the "organization" members were board members, while those writing at the "preferred," or reduced, rates were not.

Prior to May, 1932, the defendant company had notified the plaintiff agency thirty days in advance of the expiration of policies, but ceased this practice as of that date. Miller testified that "shortly after March, 1932, and prior to June 22, 1932, I proceeded to close my accounts with the Home Fire and Marine Insurance Company"; and one Boulware testified that, about the latter date, Miller told him that he (Miller) had severed his connection with that company.

On June 20, 1932, Culver wrote the Miller Agency from Helena, as follows: "Since the retirement of the Home Fire and

Marine from your agency and pending an appointment of an agent in Butte, you have been sending endorsements, transfers, assignments, etc., which needed counter-signature, to the writer for same. In future, and in order to expedite the manner of handling these documents, thereby saving time at both ends of the line, please be advised that Davis and Schilling, 207 Metals Bank Bldg., Butte * * * are now our authorized agents and they will be pleased to countersign such documents in the future.''

With reference to the ordinary contract, this evidence, adduced by the plaintiff, is sufficient to warrant a finding that the contract was terminated by mutual consent, or that it was terminated by the written notice of plaintiff, in that it is apparent to the court either that the evidence showed that plaintiff had withdrawn from writing insurance in ''Board Companies'' and was acting for nonboard companies, or that, if the case was permitted to proceed, defendant's proof would clearly establish that fact, and, therefore, the letter of March 15 was in effect a notice that the plaintiff would no longer be bound by the contract. This being the situation, the trial court was in the position to say that, if the case went to the jury and a verdict was returned for the plaintiff, it would be its duty to set the verdict aside.

Plaintiff, however, contends the contract could not be terminated until the expiration of all policies written by the plaintiff, as, by custom and usage, renewals belong to the agent, and therefore the contract was one ''coupled with an interest,'' and that Miller had the right of cancellation of policies for nonpayment of premiums and thus recover the unearned portions of the premiums paid in advance by him. On this latter proposition the evidence discloses that, at the time of the trial, all advancements made by Miller, as above recited, had been paid by the policy-holders, except $111.93, and it was not shown that any policy-holder included in this reduced list refused to pay the Miller Agency because of the receipt of a copy of the company's letter.

Many letters and notices (Plaintiff's Exhibits A to Z) were introduced to show transactions extending a year or more after the writing of the alleged libel and between the parties; these relate to indorsements to be made on policies in existence, permits to policy-holders, adjustment of premiums, commissions— such matters as are referred to in Culver's letter of June 20, 1932, to the plaintiff.

Miller and one other witness testified that, by custom and usage, renewals belong to the agent; Miller did not attempt to explain the meaning of the statement; the other witness, Webb, did. His explanation is vague and is summed up by his statement that where one agent has written policies any other agent has a right to seek to secure the business, but ''if a fellow gives you service you want to go for him  *  *  *  if some one gives you a square deal, you ought to treat him fairly.''

We gather from the authorities that, because of the fact that the policy-holders are the customers of the agent who solicits the business and writes the policies in any company he sees fit, ordinarily the right of renewal is an asset of the agent, who cannot be deprived of his commission on renewals, while representing the insurance company in which he has written policies, by any act of the company or its other agents, but the matter is usually regulated by contract. On the other hand, if the agency is properly terminated, the right to commissions thereafter ceases, although it has been held that this is not the case when an agent withdraws from the service with the consent of the principal. (See 32 C. J. 1078–1081; *Hale* v. *Brooklyn L. Ins. Co.*, 120 N. Y. 294, 24 N. E. 317; *Butler* v. *New York L. Ins. Co.*, 45 Wash. 141, 87 Pac. 1119; *Alliance Ins. Co.* v. *City Realty Co.*, (D. C.) 52 Fed. (2d) 271; *Arrant* v. *Georgia Casualty Co.*, 212 Ala. 309, 102 So. 447.)

Here the letter to which exception is taken, on this phase of the case, after advising policy-holders as to where they should go for service, merely expresses the hope that the company may still hold the patronage of the addressee. Certainly, neither the law nor custom requires that, when an agent ter-

minates his agency either with or without the consent of the company, for the purpose of serving a rival company, the right to renew all existing policies in the rival company remains in the agent. Such an agent can seek to interest his former customers in his new company and its rates, but cannot hold the old company responsible if the customers refuse to make the change. Plaintiff's contract does not constitute a "power coupled with an interest," as that term is defined by the authorities. (49 C. J. 1252; 64 A. L. R. 380.)

The letter here considered is a conditionally privileged publication, as it was mailed on an occasion which furnished a prima facie legal excuse for the making of it (Townshend on Slander and Libel, 4th ed., 296; Odgers on Libel and Slander, 6th ed., 206), and could, therefore, be held libelous only on a showing of actual malice. (*Cooper* v. *Romney,* supra.) "The words 'malice' and 'maliciously' import a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law." (Sec. 10713, subd. 4, Rev. Codes 1921.) The question of malice or no malice is for the jury, but there is always the prior question, "Is there any evidence of malice to go to the jury?" and this is for the judge. (Odgers on Libel and Slander, 6th ed., 284, and cases cited.)

The only evidence of "malice" in the record is that of the conversation between Miller and Culver, detailed above. This evidence indicates, in western parlance, an attempt on the part of Culver to bluff Miller into staying with the company and living up to his contract; but if it can be said to evidence ill will on the part of Culver, it does not show that the letter in question was mailed for the purpose of vexing, annoying or injuring the plaintiff. The letters were printed and addressed in the "Home Office" and sent to Culver for his signature. There is no evidence of ill will at the home office, and if Culver exhibited ill will in April, it was not the cause of sending the letters in June, as, in mailing them, he only acted as agent and under instruction from the home office, the duty of which it

was to advise their policy-holders of the change in the local agency. There is no showing of "any indirect motive other than a sense of duty" which might substantiate the charge of malice. (Odgers, above, 282.)

The facts and circumstances under which the publication was made being undisputed, the question of privilege became one of law for the court. (16 Cal. Jur. 122, and cases cited; *Manley* v. *Harer*, supra. See, also, Newell on Slander and Libel, 2d ed., 391.)

The plaintiff failed to establish its charge that the publication was "false and unprivileged," and, therefore, the motions for nonsuit were properly granted.

Judgment affirmed.

Associate Justices Stewart, Anderson and Morris concur.

Mr. Chief Justice Sands, absent on account of illness, takes no part in the foregoing decision.